IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

APR 1 0 2015

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

UNITED STATES OF AMERICA,
Plaintiff,

v.  Criminal No. 2:15-cr-1

NOEL BARRERA SILVA,
Defendant.

## REPORT AND RECOMMENDATION/OPINION

This matter is before the undersigned for consideration of Defendant Noel Barrera Silva's "Motion to Suppress," filed on March 3, 2015 (Docket No. 23), and "Motion to Suppress Statements," filed on March 9, 2015 (Docket No. 27). On March 4 and 11, 2015, the Government filed its responses. (Docket Nos. 26 and 33.) On April 7, 2015, came Defendant, in person and by counsel, L. Richard Walker, and the United States, by Assistant United States Attorney Stephen Warner, for hearing on Defendant's motions. Johnnie Benningfield was sworn as interpreter.

### I. PROCEDURAL HISTORY

On January 6, 2015, a Grand Jury sitting in the Northern District of West Virginia returned a one-count Indictment against Defendant, charging him with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C). (Docket No. 3.) Defendant appeared before United States Magistrate Judge Robert Trumble for an initial appearance, arraignment, and detention hearing on January 12, 2015, at which time he entered a "Not Guilty" plea to the Indictment. Trial is scheduled to begin with jury selection on June 16, 2015.

### II. CONTENTIONS OF THE PARTIES

*A.   Motion to Suppress Evidence*

Defendant contends that the stop and search of the vehicle that he was driving on December

22, 2014, was illegal and unconstitutional because the officers "lacked probable cause that a traffic violation had occurred or was occurring." (Docket No. 23 at 2.) According to Defendant, officers lacked probable cause to pull him over for "failure to use headlights in inclement weather" because "(1) it was not raining and (2) conditions were not inclement otherwise, as the ability to see clearly, and to discern people and vehicles on the street at a distance was not so severely reduced, such that headlights must necessarily have been required." (Id.)

The Government contends that Defendant's motion should be dismissed based upon the exhibits attached to its response, including still photographs from the video of the traffic stop and the officers' report from the traffic stop. (Docket No. 26 at 1.) The Government asserts that the "two pretextual reasons for the traffic stop (no headlights in the rain and fog, and obstructed registration) were used in order to protect the confidential informant." (Id. at 3.) The Government also argues that officers had probable cause to believe that a felony drug offense was occurring inside the vehicle. (Id.)

### B. *Motion to Suppress Statements*

Defendant requests that the Court "prohibit the government from introducing evidence of the three alleged statement [sic] made prior to being given <u>Miranda</u> warnings at the police station in Spanish on December 22, 2014." (Docket No. 27 at 5.) Specifically, Defendant requests that the following statements be suppressed: (1) when asked about drugs, Defendant told officers that they "could search anywhere in the vehicle, you will not find drugs in that car"; (2) Defendant allegedly told officers that the packages found in the hidden compartment "isn't mine I will tell you whatever you need to know"; and (3) prior to his transportation to the police station, Defendant said that "another vehicle would be coming through which contained the money for the purchase of the

suspected methamphetamine." (Id. at 2-3.) According to Defendant, these statements violated his Fifth Amendment rights because he was not read his Miranda rights in Spanish until he arrived at the police station. (Id. at 4.) Defendant asserts that Miranda warnings should have been given at the time of the stop because he was in custody, was being questioned by the police, and was aware that he was speaking to law enforcement. (Id.)

The Government asserts that Defendant's motion should be denied for the following reasons:

1. Defendant's statements were made pursuant to the limited public safety exception in New York v. Quarles, 467 U.S. 649 (1984), at the beginning of the traffic stop when police were assessing the scene;

2. Defendant's statements were made after being orally Mirandized at the scene by Trooper Campbell, waiving his Miranda rights, and informing the officers he wanted to cooperate; and/or

3. Defendant's statements were volunteered after he was orally Mirandized.

(Docket No. 33.)

### III. STATEMENT OF THE FACTS

The Court heard testimony from three (3) witnesses under oath, to wit: West Virginia State Police ("WVSP") Corporal Tom Kessel, WVSP Trooper Campbell, and WVSP Corporal Whisner. The Court also admitted several exhibits, including: (1) still photographs from the video of the traffic stop that occurred on December 22, 2014; (2) Defendant's statements; (3) Corporal Whisner's statement; (4) a photograph of the license plate on Defendant's vehicle; (5) a weather report for Petersburg, West Virginia, for December 22, 2014; (6) a weather report for Winchester, Virginia, for December 22, 2014; and (7) a copy of W. Va. Code § 17C-15-2. (Docket No. 35-1 to 35-8.) The undersigned finds that all testimony is credible, and finds the following facts:

The investigation of Defendant began on or about November 19, 2014. On that date, a

controlled meeting occurred between Defendant and a confidential informant ("CI") at the Kentucky Fried Chicken/Taco Bell in Moorefield, Hardy County, West Virginia. Prior to the meeting, Corporal Kessel arrived at the location to conduct surveillance. Defendant was seen arriving in a white Ford Explorer Sport Track. During the meeting, which was recorded by the device with which the CI was equipped, the CI and Defendant discussed a future purchase of methamphetamine. Defendant indicated that he would acquire the methamphetamine and deliver it to the CI.[1] Following the meeting, Defendant was stopped by Trooper Nazelrod for a traffic infraction.[2] During that stop, Defendant provided the address for his residence in Moorefield. Subsequently, officers began to conduct surveillance of that residence.

A second controlled meeting between Defendant and the CI occurred on December 1, 2014. The purpose of this meeting was to obtain more detail about the quantities of methamphetamine to be potentially delivered. However, Defendant and the CI did not finalize a date or amount for the delivery. A third controlled meeting occurred at some point, at which Defendant indicated that he would be receiving anywhere from three (3) pounds to four (4) kilograms of methamphetamine. Defendant indicated that the product would be delivered from California and that he would then initiate delivery to the CI.[3]

---

[1] Defendant and the CI spoke in Spanish during the meeting; however, the CI provided officers with an account of what was discussed. Corporal Kessel testified that officers had no problems communicating with the CI in English.

[2] Corporal Kessel testified that he had provided a description of Defendant's vehicle to Trooper Nazelrod and had asked him to conduct a traffic stop if he observed any traffic infractions.

[3] These controlled meetings also occurred in Spanish; however, the CI provided officers with an account of what was discussed. Again, officers had no problems communicating with the CI.

On December 22, 2014, officers met with the CI and arranged for the CI to make a controlled call to Defendant. During that call, Defendant indicated that he had received his product, and he and the CI agreed to meet at the 7-11 in Wardensville, Hardy County, West Virginia, to conduct the drug transaction. Thereafter, officers began surveillance of Defendant's residence in Moorefield and the vehicles located there. Officers also set up surveillance from Defendant's residence to the 7-11 in Wardensville. Task force officers contacted Trooper Campbell to assist, and Trooper Campbell positioned his marked cruiser off of Route 55 in Wardensville. Corporal Kessel advised Trooper Campbell that task force officers believed Defendant would be transporting methamphetamine in his vehicle.

Originally, officers were looking for a black Ford truck with California plates. However, Corporal Kessel received word from the CI that Defendant had contacted the CI to tell him that he was traveling through Baker, West Virginia.[4] Surveillance at Defendant's residence informed Corporal Kessel that a black Ford Expedition had left the residence, and that the location of the black Ford truck was not consistent with Defendant's message that he was traveling through Baker. Accordingly, officers began looking for the black Ford Expedition, and Corporal Kessel told Trooper Campbell to watch for the same. Corporal Kessel told Trooper Campbell that he would advise when the vehicle was close to his location so that Trooper Campbell could conduct a traffic stop.

Corporal Kessel and Trooper Campbell testified that it was "moderately" raining with a bit of fog on December 22, 2014.[5] Corporal Kessel was using his windshield wipers to keep water off the windshield while conducting surveillance. Shortly after receiving word that Defendant was

---

[4] Baker is between Moorefield and Wardensville.

[5] Trooper Campbell also stated that it was slightly icy.

traveling through Baker, Corporal Kessel identified the black Ford Expedition traveling eastbound on Route 55. He observed two (2) male individuals in the vehicle and noticed that the vehicle's headlights were not on, even though it was raining and foggy. Corporal Kessel began following the Ford Expedition. He also notified Trooper Campbell that the vehicle was traveling in Trooper Campbell's direction.

Approximately twelve (12) to fifteen (15) minutes later, the black Ford Expedition passed the location where Trooper Campbell had stationed his cruiser. Trooper Campbell observed that the vehicle's headlights were not on even though it was raining. Trooper Campbell also observed that the registration sticker on the vehicle's license plate was obstructed by the metal frame around the plate. Because of these, Trooper Campbell pulled out and conducted a traffic stop, and Defendant pulled into the parking lot of a realty business on the left side of Route 55. Corporal Kessel, who had been following Defendant, assumed a location where he could monitor the stop. Corporal Whisner arrived at the scene about two (2) minutes later. All of the officers were wearing their jackets because of the rain.

Once Trooper Campbell stopped Defendant's vehicle, he approached the driver's side of the vehicle. Sergeant Plummer approached the passenger's side. Trooper Campbell saw that Defendant was the driver, that there was a male passenger up front, and that a small child was behind the driver's seat. Trooper Campbell asked Defendant to step out of the vehicle with his license, registration, and proof of insurance. Defendant stepped out and advised Trooper Campbell that he had an identification card and not a driver's license. Defendant was very cooperative and spoke English well; Trooper Campbell asked Defendant if he understood him and Defendant replied that he did. Trooper Campbell told Defendant that he had stopped him for not having his headlights on

and that the registration sticker on his license plate was obstructed. Defendant agreed that he should have had his headlights on.

Trooper Campbell testified that Defendant showed a heightened level of nervousness. Because of that, Trooper Campbell asked Defendant if there were any weapons, illegal controlled substances, or large amounts of money in the vehicle. Defendant responded, "You can search anywhere in the vehicle, you will not find drugs in that car." (Docket No. 35-2.) Trooper Campbell asked Defendant, in Spanish, if they could search the car; Defendant agreed to a search. He explained to Defendant that a canine unit would be walked around the perimeter of the vehicle so that officers could see if the canine alerted. Trooper Campbell went over a list of controlled substances that the canine would alert to. When he mentioned methamphetamine, Defendant's demeanor changed, and he said, "No, no, no, I just work."

Trooper Campbell retrieved Jackson, his canine unit, and conducted two passes of the vehicle. Jackson alerted high on the driver's side rear door. Trooper Campbell put Jackson back into his cruiser and advised Defendant that officers would conduct a hand search of the vehicle. Defendant, his daughter, and the passenger waited at the rear of the vehicle with Corporal Whisner. Corporal Whisner provided a rain jacket for Defendant and his daughter. Upon searching the vehicle, officers located packages, wrapped in duct tape, in the ceiling of the car.

Upon finding the methamphetamine, Trooper Campbell placed Defendant under arrest and advised him of his Miranda rights in English. Defendant stated that he understood his rights. Afterwards, Trooper Campbell asked Defendant about the packages. Defendant stated, "Please, it isn't mine I will tell you what you need to know." (Docket No. 35-3.) Trooper Campbell contacted task force officers to tell them that Defendant was willing to talk to them. Prior to being transported,

Defendant mentioned to Corporal Whisner that the vehicle which contained the money for the methamphetamine would be coming through.

The parties agree that two provisions of the West Virginia Code are relevant to this matter. First, W. Va. Code § 17C-15-2 provides:

> Every vehicle other than a school bus, motorcycle, motor-driven cycle or moped operated upon a highway within the state at any time from sunset to sunrise, or during fog, smoke, rain or other unfavorable atmospheric conditions, or at any other time when there is not sufficient light to render clearly discernible persons and vehicles on the highway at a distance of five hundred feet ahead, shall display lighted head lamps and illuminating devices as hereinafter respectively required for different classes of vehicles, subject to exceptions with respect to parked vehicles as provided for in subsection (c), section fifteen-c of this article. Every school bus, motorcycle, motor-driven cycle and moped shall display lighted head lamps at all times when upon the highway.

Furthermore, W. Va. Code § 17A-3-15(b) provides:

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible.

As noted above,

## IV. ANALYSIS

### A. *Motion to Suppress Evidence*

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, "'[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"" Kentucky v. King, 131 S. Ct. 1849, 1856 (2011) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). Reasonableness is determined by "look[ing] at the 'totality of the circumstances' of each case to see whether the detaining officer has a

'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (alteration in original); see also Ohio v. Robinette, 519 U.S. 33, 39 (1996) ("Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.").

A police officer's decision to stop a vehicle and briefly detain its passengers constitutes a "seizure" within the meaning of the Fourth Amendment. See Whren v. United States, 517 U.S. 806, 810 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979) (citations omitted). Probable cause exists to make a traffic stop when "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. Draper v. United States, 358 U.S. 307, 313 (1959). Generally, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810.

An officer may also conduct a traffic stop if he has reasonable suspicion to do so. United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). Courts employ an objective test to determine whether a vehicle stop is constitutional. See Whren, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993). The reasonable suspicion standard "may be satisfied by an officer's objectively reasonable suspicion that drugs are present in a vehicle that he lawfully stops." United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998); see also United States v. Sharpe, 470 U.S. 675, 687-88 (1985) (stop of vehicle reasonable when authorities observed circumstances indicative of drug trafficking).

The parties agree that two provisions of the West Virginia Code are relevant to this matter.

First, W. Va. Code § 17C-15-2 provides:

> Every vehicle other than a school bus, motorcycle, motor-driven cycle or moped operated upon a highway within this state at any time from sunset to sunrise, or during fog, smoke, rain or other unfavorable atmospheric conditions, or at any other time when there is not sufficient light to render clearly discernible persons and vehicles on the highway at a distance of five hundred feet ahead, shall display lighted head lamps and illuminating devices as hereinafter respectively required for different classes of vehicles, subject to exceptions with respect to parked vehicles as provided for in subsection (c), section fifteen-c of this article. Every school bus, motorcycle, motor-driven cycle and moped shall display lighted head lamps at all times when upon the highway.

Furthermore, W. Va. Code § 17A-3-15(b) provides:

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent from swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible.

Here, it is clear from the record that it was raining on December 22, 2014. Corporal Kessel had to use his wipers to keep water off of his windshield while conducting surveillance. Furthermore, officers were wearing rain jackets during the traffic stop. Accordingly, the weather required use of headlights. However, when Defendant's vehicle passed Corporal Kessel's location, Corporal Kessel noticed that Defendant's headlights were not on. When Defendant's vehicle passed Trooper Campbell's location, Trooper Campbell also observed that Defendant's headlights were not on. Still photographs from the video of the traffic stop clearly show drops of water on the officers' rain jackets. Accordingly, Trooper Campbell had probable cause to believe that Defendant was violating W. Va. Code § 17C-15-2. See Whren, 517 U.S. at 810. Indeed, after Trooper Campbell told Defendant when he was stopped, Defendant agreed that he should have had his headlights on. Trooper Campbell also testified that when he pulled out to conduct a traffic stop, he observed that

the registration sticker on Defendant's license plate was obscured by the metal frame around the plate. Accordingly, Trooper Campbell had probable cause to believe that Defendant was violating W. Va. Code §§ 17C-15-2 and 17A-3-15(b).

Furthermore, Trooper Campbell had not only probable cause, but reasonable suspicion, to stop Defendant's vehicle. At the suppression hearing, Corporal Kessel testified that three (3) controlled meetings had occurred between Defendant and the CI regarding the purchase of a quantity of methamphetamine. On December 22, 2014, the CI placed a call to Defendant, and Defendant indicated that he had received his shipment and was traveling through Baker to meet the CI in Wardensville. Corporal Kessel provided this information, as well as information regarding Defendant's vehicle, to Trooper Campbell so that Trooper Campbell could conduct a traffic stop. Because of this information, Trooper Campbell believed that Defendant was transporting narcotics at the time the stop was conducted. See Branch, 537 F.3d at 335; Sakyi, 160 F.3d at 169; see also Sharpe, 470 U.S. at 687-88.

Given this, the undersigned finds that Trooper Campbell had not only reasonable suspicion, but also probable cause, to conduct a traffic stop of Defendant's vehicle. Accordingly, Defendant's argument that the "traffic stop was illegal and baseless" (Docket No. 23 at 5) is without merit, and the undersigned recommends that Defendant's motion to suppress evidence be denied.

### B. *Motion to Suppress Statements*

It is well established that when a defendant is subject to custodial interrogation, he "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" before any questioning occurs. Miranda v. Arizona, 384 U.S. 436, 444 (1966). The "safeguards

prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). "Custodial interrogation refers to 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" United States v. Uzenski, 434 F.3d 690, 704 (4th Cir. 2006) (quoting Miranda, 384 U.S. at 444.) The "operative question is whether, viewed objectively, 'a reasonable man in the suspect's position would have understood his situation' to be one of custody." United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007).

An individual subject to custodial interrogation may waive his Miranda rights; however, for such a waiver to be valid, it must be voluntary, knowing, and intelligent. Miranda, 384 U.S. at 444. A waiver does not have to be express, but can be implied from the individual's actions and words. North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Cardwell, 433 F.3d 378, 389-90 (4th Cir. 2005) (finding that a defendant's willingness to answer questions after acknowledging that he understands his Miranda rights constitutes an implied waiver of rights).

Whether a defendant has voluntarily waived his Miranda rights is determined by the "totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." United States v. Braxton, 112 F.3d 777, 781 (4th Cir. 1997) (en banc) (internal quotation marks omitted); see also Moran v. Burbine, 475 U.S. 412, 412 (1986). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." Braxton, 112 F.3d at 781 (internal quotation marks omitted); see also United States v.

12

Montgomery, 555 F.3d 623, 629 (7th Cir. 2009) ("Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him."). Because of the requirement that police activity must be coercive before a statement will be classified as involuntary, few incriminating statements are found to be involuntary. Id. at 786. The Fourth Circuit has held that when determining whether a defendant's will has been overborne, the "crucial element" is "police overreaching." United States v. Cristobal, 293 F.3d 134, 141 (4th Cir. 2002).

As noted above, Defendant moves for the Court suppress three (3) statements. First, when asked about whether there were any drugs, weapons, or large amounts of currency in the vehicle, Defendant told Trooper Campbell "you can search anywhere in the vehicle, you will not find drugs in that car." Second, when Trooper Campbell asked about the packages found in the vehicle, Defendant stated "please, it isn't mine I will tell you whatever you need to know." Third, while waiting to be transported, Defendant told Corporal Whisner that the vehicle which contained the money for the methamphetamine would be coming through. The undersigned has considered each statement in turn.

1.  **Defendant's First Statement**

There is no question that Defendant's first statement, made in response to Trooper Campbell's question of whether there were any controlled substances or weapons in the vehicle, was made prior to when he received his Miranda warnings. Accordingly, the undersigned must determine whether Defendant was subject to custodial interrogation at the time he made this statement and, if he was in custody at the time of the statement, whether the public safety exception

13

to Miranda applies.[6]

The Supreme Court has observed that while "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so," "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Berkemer, 468 U.S. at 436, 440. "In short, while a motorist during a routine traffic stop is detained and not free to leave, the motorist is not 'in custody' for Miranda purposes." United States v. Sullivan, 138 F.3d 126, 131 (4th Cir. 1998). Furthermore, when "the stop is over and its purpose served, however, mere questioning by officers, without some indicated restraint, does not amount either to custody for Miranda purposes or a seizure under the Fourth Amendment." Id.

The undersigned finds Sullivan to be instructive in this matter. The facts presented in Sullivan were as follow:

> At midday on January 23, 1996, United States Park Police Officer Franz Ferstl stopped a car traveling northbound on the George Washington Memorial Parkway in Virginia because the car was missing its front license plate. After Robert Sullivan, the driver, produced his driver's license and car registration, Officer Ferstl noticed that the missing license plate was displayed on the car's dashboard. The officer then asked Sullivan whether the had any outstanding traffic tickets in Virginia. With that question, Sullivan's demeanor changed noticeably. He responded that he believed he owed $30 on a ticket he had received for making an illegal u-turn. Suspecting that Sullivan's license may have been suspected, Officer Ferstl returned to his police cruiser in order to run a check on Sullivan's driving record. Since the Park Police computer was "down" at the time, Ferstl requested assistance from the Airport Police at nearby Washington National Airport. Between five and ten minutes later, Airport Police Officer Roscoe Evans arrived on the scene and ran the check on Sullivan's license and registration. The computer check took less than five minutes to complete and came up negative. After Ferstl indicated that he had the situation under control,

---

[6] In New York v. Quarles, 467 U.S. 649, 657 (1984), the Supreme Court carved out a narrow exception to Miranda, concluding "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." The availability of the exception "does not depend upon the motivation of the individual officers involved." Id. at 656.

14

> Evans departed the scene. Officer Ferstl then returned to Sullivan's car, handed Sullivan his license and registration, and advised Sullivan to take care of the unpaid ticket and replace the missing license plate. The traffic stop at this point had lasted approximately 15 to 20 minutes.
>
> When Sullivan's driving record appeared clean, Officer Ferstl suspected that "there [was] something else wrong here." Accordingly, after returning Sullivan's license and registration, Ferstl asked Sullivan "if he had anything illegal in the vehicle." Sullivan hesitated before responding, and Ferstl noticed that his lip "started to shake and quiver." Sullivan then responded, "illegal?!" with his "tone raised." Becoming more suspicious, Ferstl repeated the question. This time, instead of answering, Sullivan only "turned his head forward and looked straight ahead." Ferstl then told Sullivan that "if he had anything illegal in the vehicle, it's better to tell me now." When Sullivan still did not answer, Ferstl again asked him what he had in the car and told him that "he could tell me . . . . I would be cool with him." After Ferstl asked Sullivan another time what was in the car, Sullivan finally replied, "I have a gun." Ferstl then asked Sullivan where the gun was located, and Sullivan replied, "under the seat." This dialogue lasted "probably less than a minute."

Id. at 129. Officer Ferstl placed Sullivan under arrest and later released him with a citation charging him with illegal possession of a handgun. Id. Later, however, the Government learned that Sullivan had previously been convicted of armed robbery, and the Grand Jury returned an Indictment charging him with being a felon in possession of a firearm. Id. Sullivan moved to suppress both his confession and the firearm "on the grounds that the confession was involuntary and had been obtained in violation of his [Miranda] rights." Id. (alteration in original). The district court granted his motion, and the Government noted an interlocutory appeal. Id. at 129-30.

The Fourth Circuit reversed the district court's order suppressing Sullivan's confession and the gun and remanded the case for further proceedings. Id. at 134. Specifically, the Fourth Circuit noted:

> The facts relevant to whether Sullivan was "in custody" are readily summarized. Following the traffic stop and after its purpose had been served, Officer Ferstl, prompted by a lingering suspicion that something was amiss, asked Sullivan whether he had anything illegal in the car. When Sullivan would not directly answer the question, the officer repeated it several times. During the course of the dialogue,

15

which lasted less than a minute, the officer advised Sullivan that it would be better "to tell me now" and that he "would be cool" with Sullivan. The questions culminated with Sullivan's admission that he had a gun under the front seat.

> This conversation included no threats or statements that Sullivan was being detained, and it occurred at midday on the side of a highway in full public view. . . . There is no hint from anything Officer Ferstl said or from how he conducted himself to suggest that Sullivan was under arrest or was being detained as if he were under arrest. The officer had returned Sullivan's license and registration to him before questioning him. The mere fact that Ferstl did not affirmatively advise Sullivan that he could refuse to answer Ferstl's questions or that he was free to go did not transform the encounter into a custodial interrogation. . . . Even "drawing weapons, handcuffing a suspect, placing a suspect in a patrol care for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for <u>Miranda</u> purposes." . . . While we accept the factual findings made by the district court in this case–which, we note, Sullivan also does not challenge–we conclude as a matter of law that Sullivan was not in custody for purposes of <u>Miranda</u> while being questioned by Ferstl.

<u>Id.</u> at 131-32.

Here, like in <u>Sullivan</u>, Trooper Campbell asked Defendant if Defendant had any illegal substances or weapons in the vehicle. Nothing in the record from anything Trooper Campbell said to how he acted suggests that Defendant was under arrest or was being detained as if under arrest. As the Fourth Circuit has said, "[t]he mere fact that [Campbell] did not affirmatively advise [Defendant] that he could refuse to answer [Campbell's] questions or that he was free to go did not transform the encounter into a custodial interrogation." <u>Id.</u> at 132 (alterations in original). Furthermore, unlike in <u>Sullivan</u>, Trooper Campbell did not question Defendant repeatedly. Given this, the undersigned finds that Defendant was not in custody for purposes of <u>Miranda</u> when he provided his first statement. Accordingly, the undersigned need not consider whether the public safety exception applies, and recommends that Defendant's first statement not be suppressed.

2. **Defendant's Second Statement**

To consider whether Defendant's second statement should be suppressed, the undersigned

must first determine whether it was made prior to when Defendant was given his Miranda rights are after such time. Trooper Campbell testified that after finding the packages of methamphetamine in Defendant's vehicle, he placed him under arrest and gave him his Miranda rights. He testified that after that, he asked Defendant about the packages, and Defendant responded by saying "please, it isn't mine I will tell you whatever you need to know." However, his report from the event states that Defendant made this statement prior to being given his Miranda rights. (Docket No. 35-3.) The undersigned credits Trooper Campbell's testimony, which was given under oath, over his report, which is an unsigned, unsworn statement. Furthermore, Trooper Campbell testified that he wrote the report a week after the incident and that he made a mistake in writing it. The Court finds this to be a credible explanation for the inconsistency between his testimony and the report. In any event, Defendant presented no evidence to rebut Trooper Campbell's statement that he provided Defendant with the Miranda warnings before Defendant made this statement. Accordingly, the undersigned finds that Defendant was provided his Miranda warnings before making the statement that the packages were not his and that he would tell officers whatever they wanted to know.

Upon consideration of the record, the undersigned finds that Defendant implicitly waived his Miranda rights by answering Trooper Campbell's question. While Defendant did not sign a written waiver at the scene, he did not refuse to answer Trooper Campbell's question. Such behavior constitutes an implied waiver of his rights. See Cardwell, 433 F.3d at 389-90. Furthermore, nothing in the record suggests that Defendant's will "ha[d] been overborne or his capacity for self-determination critically impaired" when Trooper Campbell asked him about the packages. Braxton, 112 F.3d at 781 (internal quotation marks omitted). Nothing in the record leads the undersigned to find that the "crucial element" of "police overreaching" was present when Trooper Campbell asked

Defendant about the packages. Cristobal, 293 F.3d at 141.

After determining that a waiver is voluntary, a court must then determine whether that waiver is knowing and intelligent. Cardwell, 433 F.3d at 389. A reviewing court looks at whether a defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran, 475 U.S. at 421. "The Miranda warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him." Colorado v. Spring, 479 U.S. 564, 574 (1987).

As noted above, Trooper Campbell gave Defendant his Miranda warnings in English. Defendant replied that he understood his rights. Nothing in the record rebuts this finding. Accordingly, the undersigned finds that Defendant's second statement was given voluntarily, knowingly, and intelligently, and should not be suppressed.

### 3. Defendant's Third Statement

As an initial matter, Defendant's third statement, regarding the other vehicle containing the money for the methamphetamine, was clearly made after Defendant received his Miranda rights. Nevertheless, the undersigned also finds that by making this statement, Defendant implicitly waived his Miranda rights. This statement was not made in response to any questioning by officers; rather, Defendant voluntarily and spontaneously made this statement to Corporal Whisner. See Cardwell, 433 F.3d at 389-90. Furthermore, the undersigned has already found that Defendant understood his Miranda rights, making his implied waiver knowingly and intelligently made. See Moran, 475 U.S. at 421. Accordingly, the undersigned recommends that Defendant's third statement, concerning the other vehicle with the money for the methamphetamine, not be suppressed.

## V. RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Defendant's "Motion to Suppress" (Docket No. 23) be **DENIED**, and that Defendant's "Motion to Suppress Statements" (Docket No. 27) be **DENIED**.

Any party may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 10 day of April, 2015.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE